# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL HOBBS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 13 C 5520** |
| | ) | |
| **v.** | ) | **Magistrate Judge JeffreyCole** |
| | ) | |
| **CAROLYN W. COLVIN, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Michael Hobbs seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying him Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Hobbs asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Hobbs received SSI as a child. But once a recipient reaches age 18, his case is reassessed under the standards applicable to adults. It was determined that Mr. Hobbs did not meet those standards as of June 1, 2009. (R. 20). That determination was upheld on reconsideration and Mr. Hobbs requested a hearing. An administrative law judge ("ALJ") convened a hearing on November 7, 2012, at which Mr. Hobbs, represented by counsel, appeared and testified, along with his mother. In addition, Dr. Larry Kravitz testified as a medical expert, and Susan Entenberg testified as a vocational expert. (R. 490-535). On April 12, 2010, the ALJ issued a decision finding that Mr.

Hobbs was not disabled because he retained the capacity to perform work that was limited to simple, one- to three-step tasks in a routine, predictable environment, with limited supervision, and did not involve joint tasks, and only incidental contact with the general public. (R. 20-31). As such, he would be able to perform jobs like dishwasher or janitor. (R. 31). This became the final decision of the Commissioner when the Appeals Council denied Mr. Hobbs's request for review of the decision on June 24, 2013. (R. 5-7). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Hobbs has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### The Vocational Evidence

Mr. Hobbs was twenty-two years old at the time of his hearing. (R. 496). He quit school in the middle of tenth grade. (R. 496). He was hoping to get his GED, but had no transportation. (R. 497). He has never worked. He'd like to work at a fast food restaurant, but claims there are none close enough to his house. (R. 522-23). He lived with his mother and older brother, both of whom were drawing SSI. (R. 497-98, 505). According to his mother, he spent his days smoking marijuana, perusing internet pornography, watching TV, and partying with his friends. (R. 428).

### B.

### The Medical Evidence

There is very little medical evidence in the record. In his brief, Mr. Hobbs focuses on old grammar school records. In general, they showed he did not perform at his expected grade level,

needed extra support and attention from teachers, was easily distracted, required more time than normal to complete tasks, but also did not apply himself and wanted to quit school. (R. 232, 235, 255-56, 281, 288, 291, 308, 337-38, 352, 360, 363, 401). He was held back in third grade and then put in special education classes. (R. 319-20, 514).

The disability agency arranged a consultative examination for Mr. Hobbs with psychologist Jeffrey Karr, on June 10, 2009. He went to the exam with his mother. She said that he generally slept until 1 pm and needed regular reminders about hygiene. His principal daily activity was smoking marijuana, for which she gave him money. He got mad if she didn't. He started his marijuana use at age 12. He visited with friends and his girlfriend, who would bring their baby along. He watched TV and went to bed between 2 and 4 a.m. (R. 428). He was able to use a microwave to prepare food and could use public transportation. He could use a computer, mostly to look at pornography. He refused to do chores. (R. 428). His mother claimed that she was on drugs when pregnant and Mr. Hobbs had drugs in his system when he was born. (R. 428). She said he had multiple arrests and was on probation for burglary. (R. 429).

Mr. Hobbs met separately with Dr. Karr. He told the doctor he quit school in 10th grade as a special education student. He said he had a job for 5 months at a nearby store doing stock work. He said he was able to cook, shop, do laundry, travel, and use a computer. He went to parties with friends and enjoyed TV. He said he had been arrested three times, but couldn't recall what for. (R. 429).

Dr. Karr noted Mr. Hobbs appeared neat and clean, alert, responsive, and a quick study. He did not exhibit overt oppositional behavior. Mood and affect were congruent. He made limited eye contact and sometimes responded slowly. For the most part, he was able to persist. (R. 429).

Testing revealed an ability to use trial and error methodology, alertness, ability to attend to task, but difficulty with response time. (R. 430). Full scale IQ was 76; verbal was 76; perceptual reasoning was 86; working memory was 86; processing speed was 74. (R. 427). Diagnosis was learning disorder, cannabis abuse, and borderline intellectual functioning. (R. 430).

State disability agency psychologist Thomas Low reviewed the file on June 23, 2009. He noted diagnoses of learning disorder and cannabis abuse. (R. 461). He noted that reports indicated that Mr. Hobbs did poorly in school but had not applied himself and wanted to quit. He was not psychotic and his cognitive functions were intact. He could perform simple work, but would need a job with limited contact with co-workers and supervisors. (R. 434). Dr. Low felt that Mr. Hobbs was moderately limited in his ability to remember, understand, and carry out detailed instructions. He was not significantly limited with regard to simple instructions. He was moderately limited in his ability to respond appropriately to supervisors and get along with co-workers. His was moderately limited in the ability to set realistic goals. (R. 433).

That was about the time Mr. Hobbs's child's disability benefits were terminated and his status was to be reassessed. The next time Mr. Hobbs saw Dr. Karr, less than two years later on May 2, 2011, he and his mother were trying to get him back on the SSI roles. Their presentation changed. Incredibly, when asked about her son's marijuana use this time, Ms. Walker – who funded her son's cannabis habit – said, "he has never used any to my knowledge." (R. 457). Mr. Hobbs also denied any marijuana use past or present. (R. 457). His mother had with her some unfilled prescriptions for him for Abilify and Xanax. He had run out of Abilify after a month. (R. 457). He had previously had prescription for Prozac and Zyprexa. (R. 57). She said he was argumentative and rude, and had not showered for 10 days. (R. 456). Dr. Karr, however, noted there was no apparent

hygiene problem at the exam. (R. 456). He was able to use a computer, travel by public transportation, and use a microwave. (R. 456). He slept most of the day and stayed out most of the night. (R. 456). She claimed he had trouble keeping friends. (R. 456).

Once again, Dr. Karr interviewed Mr. Hobbs separately from his mother. He said he got up at 4 pm, went to bed at 6 am, and had multiple interests and friendships. He went on Facebook, was able to use a microwave, and use public transportation. (R. 457). Contrary to what his mother had reported, he denied ever having taking any prescription medication. (R. 457). He admitted he had a temper and would get angry when his mother told him to do something more than once. (R. 457).

Dr. Karr saw no signs of substance abuse, muscle tremor, restlessness, or physical discomfort. Mr. Hobbs seemed uncomfortable with the interview, and reluctant to participate. His answers were succinct, coherent, blunt, and accompanied by limited eye contact. His mood was grossly intact, but he gave minimal effort and had a low frustration level. (R. 458). Dr. Karr noted more than once that both Mr. Hobbs and his mother were poor or questionable historians. (R. 458-59). Diagnoses were cannabis abuse history and learning disorder per history. (R. 459). Dr. Karr noted that a mood disorder should be ruled out. (R. 459).

State disability agency psychologist Richard Havens reviewed the file on May 25, 2011. He noted diagnoses of borderline intelligence and learning disability. (R. 461). Mr. Hobbs did not have a condition severe enough to meet any of the listed mental impairments. (R. 462-469). He had only mild restrictions of daily activities and social functioning, and moderate limitations in concentration, persistence, and pace. He had no episodes of decompensation. (R. 470). Dr. Havens discussed the medical record and noted the inconsistent statements from Mr. Hobbs and his mother and stated that their allegations about Mr. Hobbs's limitations were only minimally credible. (R. 472). Dr. Havens

felt that Mr. Hobbs was moderately limited in his ability to remember, understand, and carry out detailed instructions. He was not significantly limited with regard to simple instructions. He was moderately limited in his ability to maintain attention and concentration for extended periods. (R. 452). He could perform repetitive, routine work, and had adequate ability to interact with co-workers and supervisors. He could adjust to minor routine changes in a work setting. (R. 454).

Mr. Hobbs first went to see Dr. Chou on January 31, 2011 "for depression and SSI." (R. 478). The clinical note from Dr. Chou is all but illegible. Mr. Hobbs complained of mood swings. The doctor's diagnosis was "bipolar and schizo disorder." She prescribed ten mg of Abilify. (R. 478). On March 11, 2011, Dr. Chou jotted a note to the disability agency on Mr. Hobbs's behalf. She said he had been under her care since January 2011, and was "totally disabled" due to "schizo affective disorder." This was despite her having him "on the maximum dosage of antipsychotics." (R. 474). Notably, the Abilify website advises that the maximum diagnosis of the drug for a schizophrenic of Mr. Hobbs's age is 30 mg – three times the dosage Dr. Chou prescribed. https://www.abilify.com/pdf/dosing-guide.pdf.

Dr. Chou next saw Mr. Hobbs and his mother on March 23, 2011. Again, her note is a challenge to decipher. His mother said he had not bathed in a week. Mr. Hobbs had no complaints, but exhibited a blunted affect. He admitted he was a smoker. Dr. Chou increased the Abilify dosage to 20 mg. (R. 479). On May 27, 2011, Dr. Chou wrote another note for Mr. Hobbs and his mother to the disability agency stating that she had seen Mr. Hobbs on a few occasions and he was in denial and could not "comply with any treatment." She added that he would need intensive treatment. (R. 475).

On June 27th Dr, Chou saw Mr. Hobbs and his mother once again. She noted that "[h]is

mother wants him to get SSI." (R. 480). Mr. Hobbs denied being a smoker this time. He again displayed a blunted affect. (R. 480). Dr. Chou discontinued Abilify and prescribed 6 mg a day of something else that is illegible, perhaps Zypreza. (R. 480). Dr. Chou saw the two again on October 8, 2011, and they had no complaints. Mr. Hobbs's affect was euthymic. Dr. Chou prescribed 20 mg of Zyprexa. (R. 481). Mr. Hobbs and his mother went in for a refill of Zyprexa on October 8, 2012. His affect was again euthymic. (R. 482).

<h3 style="text-align:center">C.</h3>

<h3 style="text-align:center">The Administrative Hearing Testimony</h3>

<h3 style="text-align:center">1.</h3>

<h3 style="text-align:center">The Plaintiff's Testimony</h3>

Mr. Hobbs testified that he lives with his mother and twenty-five-year-old brother. (R. 497). The entire family was drawing Social Security disability benefits. (R. 498, 505). Mr. Hobbs had a three-year-old son that he saw once a month and played games with. (R. 498). Mr. Hobbs said he got free medical treatment from Dr. Chou at Jackson Park Hospital. (R. 499).

Mr. Hobbs said he could read and follow a shopping list, play video games, and play board games like Monopoly. (R. 498-99). He could focus on games for hours. (R. 499). He also liked to take electronic equipment apart and make things with the pieces. (R. 500-01). He knew how to cook simple meals. (R. 502). He said he tried to take showers regularly but he was too busy and only took them every couple of days. (R. 503). He was out with his friends, playing basketball, talking to girls. (R. 503). He wanted to get a job in electronics because he was very good with his hands. (R. 504). He said he could cook, and could get a fast food job but there were none in walking distance and he had no transportation. (R. 522-23). He smoked marijuana a couple of

7

times a week with friends. (R. 517). Mr. Hobbs testified that he had never been in trouble with the police. (R. 501).

Mr. Hobbs's mother, Ms. Walker, testified that her son had no insurance, but she took him to see Dr. Chou when she went to see her. She said she got free sample medications for him there. Ms. Walker said she didn't know where to go to get her son free treatment. She said they wouldn't take him at the county hospital, because "at the time they wanted him to see their doctors." (R. 507). Basically, all Ms. Walker wanted to do there was get her son's prescription filled, but the doctors at county hospital wouldn't do that without seeing her son. (R. 507). She didn't think her son could see the doctors, though, without a referral. (R. 508). Later, Ms. Walker changed her story. She explained that she had no time to take her son to the free clinic because she had to care for his older brother and take him for treatment:

> . . . I rarely get around to Michael. Yes I do. I neglect him a lot and it's only because I don't have medical care. If I take him in. It's not like I can walk him to the clinic like I do myself and my other son. I have to go out of the way. That means I'm going to miss doing something for Lester, which is my son that is very ill also. So it's like three ill people. I don't know what to do.

(R. 531). Ms. Walker claimed that sometimes Dr. Chou would see her son and sometimes she wouldn't. (R. 531).

Ms. Walker said her son had episodes every few days, whenever he had no medicine. (R. 508). He would lock himself in his closet or hide under his bed. She never took him to the emergency room, though. (R. 508-09). She just tried to calm him down and give him one of her pills, which worked very quickly. (R. 509). She testified that he had been arrested for burglary, but then said it was trespassing. (R. 511). Ms. Walker said the case was thrown out when he "did

supervision." (R. 512). All he had to do was check in at the police station once a month for a year. (R. 512). She said she had to remind him to shower and change clothes. He would wear the same clothes for two weeks and shower only once a week. (R. 514-15). There were two fast food restaurants nearby that he could walk to if he had a job there. She didn't think he could get one because he was rarely presentable. (R. 523). The ALJ noted that Mr. Hobbs looked fine, but Ms. Walker defended her assessment:

> Yeah. He's looking pretty clean today. Because I got up and I made sure I got him clean myself. I had to get up at 6:30 this morning. "Michael, wash your face. Okay, Michael, brush your teeth. If I'm not there to tell Michael to brush his teeth or wash his face or clean his clothes, I have to wash his clothes. If I don't wash them, he is going to keep putting on that [sic] dirty clothes.

(R. 523).

## 2.

## The Medical Experts' Testimony

Dr. Kravitz then testified as a medical expert. Noting that there was very little evidence of treatment in the record, he interviewed Mr. Hobbs briefly. The doctor noted there was very little evidence of treatment, and the diagnosis on record of schizophrenia was problematic due to lack of support. (R. 524-25). There was no indication of schizophrenic symptoms like hallucinations, delusions, severe agitation, or inappropriate affect. (R. 526). Dr. Kravitz has to harken back to school records for some evidence to put his finger on, and noted that Mr. Hobbs had "always been a limited kid." (R. 528). The question, for Dr. Kravitz, was one of credibility of Mr. Hobbs and his mother. (R. 526). The doctor was hesitant to give an opinion as to whether Mr. Hobbs could work and his testimony went back and forth. He thought Mr. Hobbs would be capable of understanding and carrying out short, simple instructions and dealing with superficial contact with co-workers and

supervisors, and incidental contact with the public. He could do a job like cleaning tables at a fast-food restaurant. (R. 528). He thought Mr. Hobbs could work in a competitive environment, but then hedged and said maybe he couldn't. (R. 529). He might not be able to do so once he was outside the home on his own. (R. 529). In the end, Dr. Kravitz said he probably could not work in a competitive environment. (R. 529).

### 3.

### The Vocational Expert's Testimony

Finally, Ms. Entenberg testified as a vocational expert. She testified that a person of Mr. Hobbs's age and educational background who had the capacity to perform simple 1-2-3 step tasks, no joint tasks, but could work around other employees and have incidental exposure to the public, and deal with limited supervision in a routine, predictable environment could do a job like dishwasher, of which there were 10,000 in the Chicago regional economy. (R. 532). At this point, Ms. Walker interrupted and said she couldn't get Mr. Hobbs to wash dishes at home. (R. 532). Continuing with her testimony, Ms. Entenberg said he could also do janitorial work; there were 40,000 such jobs in the regional economy. (R. 532-33). Ms. Entenberg assured the ALJ that her testimony was in conformity with the Dictionary of Occupational Titles. (R. 534). Mr. Hobbs's counsel noted there might be a hygiene issue, but the VE said that was a vague question. And the ALJ pointed out that Mr. Hobbs looked fine at the hearing, but at the same time acknowledged what *Ms. Walker* had said about cleaning him up especially for the hearing. (R. 533-34).[1] Again, it was

---

[1] Mr. Hobbs also had no hygiene issues at his consultative examinations, and his treating doctor, Dr. Chou never noted any problems either. Her only mention of such an issue was to report Ms. Walker's claim that her son hadn't bathed in a week. (R. 479). Obviously, that was not an observation from by Dr. Chou, and common sense and human experience, which always have a role to play*, Pin Zhuang Chbyen v. Holder,*
(continued...)

a question of what and whom to believe.  (R. 534).

## D.

## The ALJ's Decision

The ALJ found that Mr. Hobbs suffered from the following severe impairments: cognitive disorder, schizophrenic disorder, cannabis abuse.  (R. 22).  The ALJ next determined that he did not have an impairment or combination of impairments that met or equaled a listed impairment.  (R. 20). She specifically found that Mr. Hobbs's mental impairments did not meet or equal the criteria for schizophrenic disorders (12.02), affective disorders (12.04), or substance addiction disorders (12.09). (R. 22).  The ALJ determined that Mr. Hobbs had only a mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration persistence and pace, and no episodes of decompensation.  (R. 22-23).

The ALJ went on to determine that Mr. Hobbs had the residual functional capacity to perform work at any exertional level that was limited to simple, one- to three-step tasks; with incidental exposure to the public; he should not perform joint tasks, but could work around other employees with limited supervision in a routine, predictable environment.  (R. 24).  Here, the ALJ summarized Mr. Hobbs's testimony and his mother's, and the medical evidence.  (R. 25-30).  Along the way, she noted that the testimony of Mr. Hobbs and his mother was inconsistent, as were their statements to the consultative examiner.  (R. 27-28).  Mr. Hobbs lied about his arrest record and drug abuse.  (R. 28).  The ALJ found his testimony and that of his mother not fully credible.  (R. 27)

---

[1](...continued)
2014 WL 4436408, 5 (4th Cir.2014); *Xu Dong Chen v. Holder* , 421 Fed.Appx. 82, 84 (2nd Cir.2011); *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010); *see generally,* Richard Posner, How Judges Think (2008), lead to the firm conclusion that Dr. Chou would have been able to tell if Mr. Hobbs had not bathed in a week and would have noted Mr. Hobbs' self-neglect.

The ALJ accorded little weight to the opinion of Mr. Hobbs's treating psychiatrist, noting it was inconsistent with her treatment notes, was rather conclusory and unsupported by the medical record, and she had a limited treatment relationship with him. (R. 28). The ALJ accorded great weight to the opinions of the agency reviewing psychologists because they were consistent with the credible evidence in the record. (R. 29). She accorded limited weight to the opinion of the medical expert, Dr. Kravitz, because he relied too heavily on subjective reports from Mr. Hobbs and his mother despite acknowledging credibility issues with their claims. (R. 29). Finally, the ALJ relied on the vocational expert's testimony to determine that Ms. King could perform work that existed in significant numbers in the regional economy and, therefore, found her not disabled and not entitled to SSI under the Act. (R. 33).

## IV.

## DISCUSSION

### A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008);

*Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The court has also assured that it is a "lax" standard, *Berger*, 516 F.3d at 544.

As occurs so often where catch phrases are involved, the phrase, "logical bridge" has taken on a life of its own as though it were some self-defining and exacting test, which requires that an ALJ's decision be viewed grudgingly. But, as Justice Holmes warned, courts must be wary of the uncritical and indiscriminate use of labels and catch phrases: "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing—phrases which originally were contributions, but which, by their very felicity, delay further analysis...." Holmes, *Law and Science and Science and Law,* 12 Harv. L.Rev. 443, 455 (1899). *See also Lorenzo v. Wirth,* 170 Mass. 596,

600, 49 N.E. 1010 (1898) (Holmes, J.)("Too broadly generalized conceptions are a constant source of fallacy").

Indeed, Judge Posner, who first used the phrase in a Social Security context in his opinion in *Sarchet,* would be the first to acknowledge that it was not meant as a self-defining test or formula. *Compare, e.g., United States v. Edwards,* 581 F.3d 604, 608 (7th Cir.2009)("We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 990 (7th Cir.2004). The point Judge Posner sought to make in *Sarchet* was that unexplained conclusions by Administrative Law Judges, as with federal judges, are not persuasive and preclude meaningful appellate review. But there is nothing particularly novel about that conclusion, as *Sarchet,* itself, recognized with its reliance on *Herron v. Shalala,* 19 F.3d 329 (7th Cir.1994). There, the court said: "Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence.

Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some minimal level his analysis of the evidence.' " *Id.* at 333–334 (citations omitted). Thus, *Sarchet* never intended that the "logical bridge" requirement compel or warrant a hypercritical approach to an ALJ's decision. The "logical bridge" requirement is not about *elegantia juris or* aesthetics. The ALJ need not build the Pont Neuf. Any span will suffice so long as it allows the reviewing court to traverse the path from the evidence to the conclusions. The ALJ's explanations in this case do that.

## B.

## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

## Analysis

Mr. Hobbs has four complaints about the ALJ's decision: the ALJ's treatment of Dr. Chou's opinion that he is totally disabled; a supposed conflict between the VE's testimony and the

Dictionary of Occupational Titles ("DOT"); a supposed flaw in the ALJ's hypothetical to the VE; and the ALJ's assessment of his credibility. We will take that last one first because this case turns on the credibility of Mr. Hobbs and his mother, from their allegations to the ALJ, to their presentations to the only two mental healthcare professionals on record as having examined Mr. Hobbs. Any other argument that Mr. Hobbs might have made is deemed waived. *Thompson v. Colvin*, 575 Fed.Appx. 668, 675 (7th Cir. 2014); *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir.2004).

## 1.

This case shows that Social Security hearings are not exempt from the basic axiom of experience that parties will exaggerate when it is to their advantage. *Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir.2009); *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir.2006); *Brown v. Chater,* 87 F.3d 963, 965–66 (8th Cir.1996).

An ALJ does not have to believe an applicant for benefits. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996), and a reviewing court must give special deference to an ALJ's credibility determination. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir.2010). Special deference is given because the ALJ, not a reviewing court, is in the best position to evaluate credibility, having had the opportunity to observe the claimant testifying. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir.2010). *Compare Ashcraft v. Tennessee,* 322 U.S. 143, 171, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (Jackson, J., dissenting)("A few minutes observation of the parties in the courtroom is more informing than reams of cold record."). What Justice Cardozo said about [s]ubstitut[ing] statute for decision," applies equally to the repeated efforts of litigants to shift the responsibility for ultimate

credibility judgments from the ALJ to the reviewing court: "you shift the center of authority, but add no quota of inspired wisdom." Cardozo, The Growth Of The Law 133 (1924).

Thus, the undeviating rule to be applied in reviewing an ALJ's credibility determination is that review is deferential. *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir.2010); *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir.2009). We look to whether the ALJ's reasons for discrediting testimony are unreasonable or unsupported, and we " 'give the opinion a commonsensical reading rather than nitpicking at it. ' Accordingly, we will overturn the ALJ's credibility determinations only if they are 'patently wrong.' " *Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir.2014); *Bates v. Colvin,* 736 F.3d 1093, 109–8 (7th Cir.2013); *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir.2010). That occurs only when the determination "lacks any explanation or support." *Murphy, supra; Elder,* 529 F.3d. at 413–14; *Berger,* 516 F.3d at 546; *Allord v. Barnhart,* 455 F.3d 818, 821 (7th Cir.2006). Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue,* 390 Fed.Appx. 581, 587 (7th Cir.2010). *See also Milliken v. Astrue,* 397 Fed.Appx. 218, 225 (7th Cir.2010)(describing the burden as "heavy.").

All an ALJ need do is minimally articulate legitimate reasons for disbelieving a claimant. *Carter v. Colvin*, 556 Fed.Appx. 523, 527 (7th Cir. 2014); *Schreiber v. Colvin,* 519 Fed.Appx. 951, 961 (7th Cir. 2013); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir.2012). The ALJ in this case certainly did that and more, basing her credibility assessment in part on Mr. Hobbs's minimal treatment history – a history not explainable by considerations of financial inability or other variables over which the claimant has no control. As the ALJ found, that history can be evidence of exaggeration, and is properly considered along with daily activities, the ALJ's observations at the hearing, and the

inconsistent statements of Mr. Hobbs and his mother, in the credibility analysis. [2]

Mr. Hobbs does not attack the balance of the ALJ's reasoning, at least not until his reply brief, but that is too late. "Arguments raised for the first time in a reply brief, however, are waived." *Favela v. Vicari,_* Fed.Appx._,_, 2014 WL 1891137, 2 (7th Cir. 2014). *See also, Carter v. Astrue,* 413 Fed.Appx. 899, 906 (7th Cir. 2011); *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir.2013); *Damato v. Sullivan*, 945 F.2d 982, 988 n.5 (7th Cir. 1991). Nevertheless, we shall address all three of Mr. Hobbs's criticisms of the ALJ's reasoning, whether raised in his opening brief or his reply brief, because it is important to get a full picture of Mr. Hobbs and his mother.

The ALJ noted that, despite alleging a crippling psychological impairment, Mr. Hobbs sought treatment on just a few occasions, which were confined to a single year, 2011. (R. 27). Given Ms. Walker's allegations that her son's condition was so severe that he would hide under his bed or in his closet every few days and not come out, the ALJ understandably and properly questioned why there was no record of at least emergency room treatment. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.").

---

[2] The ALJ relied on more than Mr. Hobbs's lack of treatment and daily activities in determining he was not credible. (Dkt. # 17, at 13-14). But even if Mr. Hobbs were correct that his lack of treatment should not be an issue, it would not undercut the balance of the ALJ's reasoning, and the ALJ 's credibility determination would still stand. *See Hoyt v. Colvin*, – F.3d –, –, 2014 WL 444161, 3 (7th Cir. 2014); *McKinzey v. Astrue*, 641 F.3d 884, 890–91 (7th Cir. 2011); *Flint v. Colvin*, 543 Fed.Appx. 598, 600 (7th Cir. 2013).

Ms. Walker first said it was because she couldn't afford it and she had no idea that free treatment was available at the county hospital, Stroger Hospital, or elsewhere. She oddly testified that they would not see her son at the Stroger Hospital because they wanted him to see their doctors. If they wanted him to see their doctors, why not take him there to see them? Free or low cost treatment is available there; the website for the hospital clearly states that "[n]o patient will be denied cook County Health and Hospitals Services based on ability to pay. http://www.cookcountyhhs.org/patient-services/billing-financial-assistance/. Of course, Ms. Walker and her family can access that website. We know they have a computer and internet service because Ms. Walker has said that Mr. Hobbs spends much of his time using it to watch porn.

The story was, as the ALJ indicated, a difficult one to buy. This is especially so given the fact that Ms. Walker later changed her story, claiming that she couldn't take her son for treatment at the clinic because she was busy with her older son, walking *him* to the clinic. (She therefore knew the clinic gave free care, contrary to her initial claim). Of course, without a job, it is unclear why Ms. Walker did not have the time to take advantage of treatment at the clinic for Mr. Hobbs, who suffered from the same impairment as her older son – or why she couldn't take them together for treatment. Her story was implausible, and implausibility, like prior inconsistencies, can be considered in making credibility determinations. *See Tijani v. Holder,* 628 F.3d 1071, 1089 (9th Cir.2010); *Capo v. Ashcroft,* 119 Fed.Appx. 823, 826 (7th Cir.2005); *Day v. Ravellette*, 10 Fed.Appx. 374, 377 (7th Cir.2001); *Emerson v. Colvin,* 2014 WL 4960779, 10 (E.D.Cal.2014);*Pinpoint, Inc. v. Amazon.Com, Inc.,* 347 F.Supp.2d 579, 583 (N.D.Ill.2004)(Posner, J.)(sitting by designation). [3]

---

[3] Indeed, while a trial court's credibility determinations are usually entitled to considerable deference, in those rare situations where the testimony the court (or ALJ) credits is internally inconsistent or otherwise
(continued...)

So clearly, the ALJ did inquire into the reasons for lack of treatment and, understandably, did not believe them. That conclusion was not "patently wrong."

Mr. Hobbs argues that the Seventh Circuit in *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) debunked the myth that free treatment is available at an emergency room, in the absence of a medical emergency.[4] That was exactly the ALJ's point. Ms. Walker was describing episodes of emergency level severity; the medical expert called her description "extreme." (R. 525). As such, any emergency room would be required to treat Mr. Hobbs even if he were indigent. But, he never went to one.

Mr. Hobbs also criticized the ALJ's consideration of his daily activities in her credibility assessment, even though such an assessment is perfectly appropriate *Warren v. Colvin,* 565 Fed.Appx. 540, 545 (7th Cir. 2014); *Pepper v. Colvin,* 712 F.3d 351, 368–69 (7th Cir.2013). Indeed, it is required under the Commissioner's own regulations. *See Heckler v. Campbell,* 461 U.S. 458, 475 (1983)(Brennan, J., concurring); SSR-96-7p; *Sanchez v. Barnhart,* 467 F.3d 1081, 1081 (7th Cir.2006); She referenced his claims that he was self-sufficient, could cook simple food and focus on video and board games. She mentioned that he socialized with friends, spent time walking the neighborhood, and could take public transportation. (R. 27-28).

---

[3](...continued)
implausible, that deference ceases. *See, Amadeo v. Zant,* 486 U.S. 214 (1988); *Anderson v. Bessemer City,* 470 U.S. 564, 573, 76 (1985); *Free v. United States*, 879 F.2d 1535, 1537 (7th Cir.1989).

[4] The Court said: "The judge thought the applicant's failure to have sought medical treatment between 2003 and 2007 inconsistent with her having a disabling medical condition. He noted her explanation that she hadn't had medical insurance or an income large enough to pay for medical treatment out of pocket, but said she could have sought treatment in a hospital emergency room. Remarkably, he seemed unaware that emergency rooms charge for their services and are required to treat an indigent only if the indigent is experiencing a medical emergency." 705 F.3d at 278.

While the ability to perform limited daily activities does not warrant the conclusion that the applicant is able to perform full-time work, *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Punzio v. Astrue,* 630 F.3d 704, 712 (7th Cir. 2012), the ALJ did not equate his activities with an ability to work full time. She *specifically* said that the activities were inconsistent with his allegations of disabling symptoms and limitations. (R. 27). For example, the ability to focus on a video game or a board game "for hours" undermines a claim that one cannot concentrate. An ability to party for hours with friends until dawn suggests at least some persistence. Taking apart electronic devices and rebuilding them into little art projects suggests at least some facility for concentration and handiwork.

Finally, and most significantly, there is the record of inconsistent statements from Mr. Hobbs and his mother and the ALJ's consideration of them in finding the witnesses not credible. Even minor discrepancies in testimony can form the basis of a valid, adverse credibility finding. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Lott v. Colvin*, 541 Fed.Appx. 702, 705 (7th Cir. 2013)("ALJ adequately justified her finding by pointing to inconsistencies in [claimant's] testimony . . . ."); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)(ALJ properly relied on inconsistencies between testimony and written statements); *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010)(ALJ properly pointed to claimant's inconsistent testimony). The discrepancies weren't so minor here. Despite the rather obvious instances depicted in the record of Mr. Hobbs and his mother lying, and despite the fact that not only the ALJ, but the medical expert and the consultative psychologist rightfully called their credibility into question, Mr. Hobbs quite unconvincingly and unpersuasively has cried foul.

In his reply brief – again, that's too late, *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 622 (7th Cir. 2012) – Mr. Hobbs submits that any inconsistencies in his testimony can be explained by him not understanding the time frame involved. He starts with his statements about his arrest record:

> At the hearing, the ALJ asked Plaintiff if he had "[a]ny trouble with the police." (R 501) She did not indicate whether she was asking about current issues or past. Plaintiff replied that he did not. *Id*. Plaintiff's mother later testified that Plaintiff had been on probation for trespassing years prior. (R 511) When the ALJ asked Plaintiff about it he indicated that he had meant he did not have any current problems with the police. *Id*.

(Dkt. #23, at 6). This is a significant distortion of the record. First of all, the exchange between the ALJ and Mr. Hobbs was not so cryptic. It actually went like this:

Q: Any trouble with the police?

A: No.

Q: No trouble?

A: No trouble.

Q: Ever been in jail?

A: No.

Q: Have you – so *absolutely no trouble with the police*?

A: No trouble *at all*.

(R. 501(emphasis supplied)).

The ALJ gave Mr. Hobbs four chances to come clean, and she made it clear she meant *absolutely* no trouble – not just recent trouble. Mr. Hobbs himself said he had had "no trouble *at all*." Moreover, Mr. Hobbs did not, as his brief asserts, explain – at least not exactly – that he

thought the ALJ's question was confined to current trouble with the police. It was more that he

didn't think his arrest was serious and didn't count because it was only once:

> ALJ: Okay. And, Mr. Hobbs, I asked you if you had had any trouble with the police
>
> and you told me no.
>
> CLMT: Well yeah it was like three years ago.
>
> ALJ: *I didn't put a time limit on it.* I asked you if you had ever been in trouble with
>
> the – sir, I need you to look at me.
>
> CLMT: Yeah.
>
> ALJ: I asked had you ever been in trouble –
>
> CLMT: It was a trespassing case. But it was a misdemeanor. They threw it out after
>
> I got off supervision. I was only for supervision for not long.
>
> ALJ: Does that mean – but the question was were you ever in any trouble with the
>
> police?
>
> CLMT: I got arrested one time, just like that one time.
>
> ALJ: And a truthful answer would have been appreciated. I'm just – putting this out
>
> there. Okay.

(R. 512)(Emphasis supplied).

So the explanation in Mr. Hobbs's brief rings hollow. Mr. Hobbs's mother even said he had

been lying, not confused – and that's quite a concession coming from her. She even went so far as

to indicate that he had no qualms about lying under oath. (R. 512). That's really not the kind of

person that should be quibbling about the ALJ's adverse credibility determination in this case.

But Mr. Hobbs presses on, complaining about the ALJ having pointed out that he lied about

23

his drug use to the consulting psychologist. Here is Mr. Hobbs's explanation for the obvious and highly significant impeachment:

> . . . when Plaintiff had his first consultative examination with Dr. Jeffrey Karr, he indicated that he uses marijuana daily. (R 428) At that time he reported he had stopped smoking marijuana three weeks prior. (R 429) When Plaintiff had his second consultative examination with Dr. Karr, about 2 years later, he reported no marijuana use. (R 457) Although Dr. Karr indicated that Plaintiff denied both past and present use, we do not have access to the questions he asked Plaintiff and thus cannot be sure it was clear that Dr. Karr was asking about past use as well as present. It is possible Plaintiff was referring to the time since his prior visit, 2 years ago, with Dr. Karr and his having not used drugs since then.

(Dkt. #23, at 6-7).

The difficulty with Mr. Hobbs's rendition of his examination with Dr. Karr is that it is false. It mischaracterizes the record in violation of a lawyer's most basic duty to a tribunal – namely the duty of candor. *See United States Dep't of Hous. and Urban Dev. v. Cost Control Mktg. & Sales Management of Va., Inc.*, 64 F.3d 920, 925 (4th Cir.1994) ("a lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy"); *United States v. Shaffer Equip. Co*., 11 F.3d 450, 458 (4th Cir.1993) ("the lawyer's duties to... advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit"); *Beam v. IPCO Corp*., 838 F.2d 242, 249(7th Cir.1988).

Contrary to the speculation in Mr. Hobbs's brief, the record reveals that Dr. Karr reported that he *specifically* asked Mr. Hobbs about *past and present* marijuana use. There is simply no basis to warrant the brief's insinuation that maybe Dr. Karr was less than precise, thereby sanitizing Mr. Hobbs's palpably false assumption that Dr. Karr might have been less than exact. There's no evidence of any mistake on the part of Dr. Karr – in contrast to the wealth of evidence that undermines Mr. Hobbs's credibility. Not surprisingly, Mr. Hobbs prefers the speculation to proof,

even though "hypothesis is not proof," *Lauth v. McCollum,* 424 F.3d 631, 634 (7th Cir.2005) (Posner, J.), and speculation can never be an adequate substitute for proof. *United States v. Landry,* 257 F.2d 425, 431 (7th Cir.1958). *Accord In re Cohen,* 507 F.3d 610, 614 (7th Cir.2007) (speculation is not evidence); *United States v. Holland,* 445 F.2d 701, 703 (D.C.Cir.1971) ("The trouble with absence of evidence is that it is consistent with *any* hypothesis.")(Emphasis in original).[5]

The record is replete with what the ALJ could quite properly find were Mr. Hobbs's mother's dissimulations, which his brief carefully puts out of view. She unabashedly lied to Dr. Karr as well. At the first exam, she said smoking marijuana was one of her son's number one activities, that he did it every day, and that she gave him the money for it. The next time she had her son see Dr. Karr, she said that her son had *never* used marijuana to her knowledge. This is stark mendacity, not confusion about timeframes. There was absolutely no reason for the ALJ to doubt Dr. Karr given what he could find were the obvious distortions of Mr. Hobbs and his mother. An ALJ is not forced to look for zebras to explain the presence of hoofprints.

Mr. Hobbs closes his attack on the ALJ's well-reasoned and unsurprisingly adverse credibility finding by asserting that it does not make sense that he would deny his drug use to the same doctor he had admitted it to before. Well, it makes sense if he is willing to lie to obtain benefits, as he and his mother appeared to the ALJ to have done. *See Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006)("Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case."); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.

---

[5] Of course, to accept Mr. Hobbs's argument would mean that every report from every doctor in these cases would be questionable since we do not have transcripts from the examinations.

2004)(unscrupulous claimants will lie or exaggerate to obtain benefits).  On their first visit to Dr. Karr, Mr. Hobbs and his mother were brutally honest about Mr. Hobbs's marijuana use, and did not get the result they desired.  The ALJ was more than justified in concluding that Mr. Hobbs and his mother adjusted their stories before their second visit.

In short, the record provided ample reasons for the ALJ to disbelieve Mr. Hobbs and his mother and she used them.  But their dishonesty infects not only their testimony before the ALJ, but their reports to mental healthcare professionals as well.  And this provides a segue to Mr. Hobbs's complaints about the ALJ's treatment of the medical opinions in this case.

## 2.

The ALJ accorded the opinion of Mr. Hobbs's treating doctor, Dr. Chou, little weight because it was a conclusory statement unsupported by the record, was inconsistent with her own treatment notes, and because she had just a brief treatment history with Mr. Hobbs.  (R. 28).  An ALJ need not accept the opinion of a treating physician that a claimant is disabled as long as she can provide good reasons for rejecting it.  *Punzio v. Astrue*, 630 F.3d 693, 698 (7th Cir.2011); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir.2010).  The ALJ did just that here, and each of the reasons she offered was a valid one.  *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)(doctor's opinion inconsistent with doctor's own treatment notes); *Skarbek v. Barnhart*, 390 F.3d 500, 503-504 (7th Cir. 2004)(doctor's opinion was not supported by medical evidence); *Bates v. Colvin,* 736 F.3d 1093, 1101 (7th Cir. 2013)(length of treatment relevant); 20 CFR § 416.927(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Mr. Hobbs finds fault with the ALJ's determination that Dr. Chou's opinion was inconsistent with the medical evidence, including Dr. Chou's own treatment notes.  But, it clearly was.  The worst

Dr. Chou's treatment notes indicated was that, on some occasions, Mr. Hobbs had a blunt affect. On others his affect was positive – euthymic. From there it is quite a leap to disabling schizophrenia. There was, as the medical expert testified, no workup to support a diagnosis of schizophrenia, let alone a disabling level of that impairment. (R. 524, 525-26). Dr. Chou said that Mr. Hobbs was on the maximum dosage of medication, and it did no good. But, she actually had not prescribed the maximum dose and also said he was not taking it.

But Mr. Hobbs was apparently complying with treatment and that treatment was effective when his mood was euthymic and neither he nor his mother had any complaints. Indeed, one might say treatment was effective if the only reported symptom was a blunt affect. There were certainly contradictions and inconsistencies in Dr. Chou's reports, and the ALJ didn't have to ignore them.

Mr. Hobbs contends that the medical expert testified that Dr. Chou's opinion and diagnosis were supported by objective findings. But Dr. Kravitz actually testified to the contrary. He said, based on the evidence, Dr. Chou's diagnosis was "problematic." (R. 524). He couldn't say for sure what prompted the diagnosis, but his "best guess" was Mr. Hobbs presenting with a blunt affect. But the diagnosis was "not really supported by the [inaudible] file." (R. 525). There were no symptoms like hallucinations, delusions, severe agitation, inappropriate affect, so the diagnosis was "not really correct." (R. 525-26).

The ALJ also noted that Dr. Chou offered some conflicting statements as well. Again, she said that Mr. Hobbs was disabled despite being on the highest possible dosage of medication, but also said he wasn't taking it. It can't have been both. And, as the ALJ said, she did have a limited treating relationship with Mr. Hobbs. As such, she did not have the "longitudinal" perspective on Mr. Hobbs that treating physicians often bring to the table. "It would be exceedingly illogical to

27

credit a doctor's opinion because he is more likely to have a detailed and longitudinal view of the claimant's impairments when in fact, there is no detail or longitudinal view." *Scheck v. Barnhart*, 357 F.3d 697, 702–03 (7th Cir.2004); *Dornseif v. Astrue*, 499 Fed.Appx. 598, 600 (7th Cir. 2013)("Although the opinions of treating physicians generally merit greater weight due to those physicians' longitudinal care, it is "exceedingly illogical" to grant that weight when the doctor observed the applicant for only a brief amount of time, as the ALJ noted that Dr. Johnson did."). Here, as in *Scheck*, Dr. Chou offers no details and no longitudinal view.

Dr. Chou's briefly jotted notes are a good example of why treating physician's opinions that their patients are disabled may sometimes be regarded with suspicion. As the Seventh Circuit has repeatedly held, a treating physician may want to do a favor for his patient seeking benefits and too quickly find disability. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). "[T]he fact that the claimant is the treating physician's patient also detracts from the weight of that physician's testimony, since, as is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits, . . . will often bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). That, the ALJ could find, seems to have been the case here, with Ms. Walker announcing to Dr. Chou when she first took her son to see her that they were there "for depression *and SSI.*" (R. 478). At a later visit, Dr. Chou acknowledged that Ms. Walker wanted to get her son on SSI. (R. 480). And so, Dr. Chou authored two brief notes, unsupported by any clinical findings or observation other than Mr. Hobbs having a blunt affect on some visits, that Mr. Hobbs was totally disabled. It was entirely proper for the ALJ to disregard those opinions.

Mr. Hobbs's brief argues that the ALJ cited no medical evidence to support his assessment

of Dr. Chou's opinion. (Dkt. # 17, at 9). But the ALJ discussed the medical evidence fairly thoroughly. (R. 25-27). It's just that there wasn't much of it. If Mr. Hobbs is arguing that the ALJ had go back and reiterate the medical evidence in connection with his discussion of Dr. Chou's opinion, that's going a bit too far with the logical bridge requirement. All that is needed is that the ALJ articulate his decision adequately enough to allow for a meaningful review. *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012). The ALJ's train of thought was clear here. She did not have to "provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir.2005); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Mr. Hobbs also argues that the ALJ should have attributed great weight to Dr. Kravitz's opinion. But the ALJ properly rejected it because it relied too heavily on subjective reports. (R. 29). Like the reasoning the ALJ provided in connection with her rejection of Dr. Chou's report, this is a perfectly acceptable rationale under Seventh Circuit precedent. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir.2012) (explaining that ALJ may discount medical opinions that are based solely on claimant's subjective complaints); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir.2008) (same); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir.2004) (stating that ALJ should rely on medical opinions based on objective observations and not those based on claimant's subjective complaints). Dr. Kravitz made it clear in his testimony that that was exactly what he did. He noted there were red flags with Mr. Hobbs's statements to the consultative examiner. (R. 526). He said the question of whether he could work "goes back to credibility." (R. 527). As we have shown, the ALJ properly found that neither Mr. Hobbs nor his mother were credible; they were unreliable historians and lied to both the ALJ and to the consultative examiner.

In the end, even when Dr. Kravitz uncritically accepted the allegations of Mr. Hobbs and his

mother, as already discussed, the doctor's opinion was rather equivocal.  On the one hand he said

Mr. Hobbs could do a simple job like clean tables at a restaurant.  On the other, he couldn't do

competitive work.  The ALJ did not err by refusing to assign his opinion great weight.[6]

### 3.

Next, Mr. Hobbs argues that the ALJ failed to resolve a conflict between the VE's testimony

and the DOT.  Notably, the ALJ specifically asked the VE whether her testimony conflicted with the

DOT.  She said no.  (R. 534).  If a vocational expert's testimony "appears to conflict with the

dictionary," SSR 00–4p requires an ALJ to obtain "a reasonable explanation for the apparent

conflict." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008); *Weatherbee v. Astrue*, 649 F.3d 565,

570 (7th Cir. 2011).  But since Mr. Hobbs's counsel did not object at the hearing, Mr. Hobbs has to

show that the conflict was "obvious enough that the ALJ should have picked up on [it] without any

assistance." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (quoting *Overman*, 546 F.3d at 463).

Here, it certainly cannot be said that it is obvious that janitorial and dishwashing work are too

complicated for someone with the capacity to perform simple, one- to three-step work.

Indeed, Mr. Hobbs does not even attempt to make such a showing.  He submits that the DOT

indicates that the jobs of janitor and dishwasher have reasoning levels of 2, which require the ability

to "apply commonsense understanding to carry out *detailed but uninvolved* written or oral

instructions."  (Dkt. # 17, at 11) (emphasis supplied).  According to Mr. Hobbs, if he is limited to

---

[6] In his reply brief, Mr. Hobbs complains that the ALJ accorded great weight to the opinions of the
state agency reviewing doctors because she found they were supported by the record.  As with Dr. Chou's
opinion, Mr. Hobbs asserts that the ALJ had to cite specific evidence that supported those opinions within
her discussion of them. That argument fails for the same reasons explained in footnote 2, *supra.*  Moreover,
it is clear that the state agency reviewers' opinions were based on Dr. Karr's findings, and the ALJ discussed
those thoroughly.  (R 26-27)

simple one- to three-step tasks, he does not have the capacity to carry out *detailed* instructions. (Dkt. #17, at 11). Mr. Hobbs does not explain how this purported conflict could be *obvious* when he did not notice it at the hearing and later had to go through some effort to unearth it.

Indeed, Mr. Hobbs's reference to the DOT begs the question of whether there is a conflict at all. He certainly has the capacity to carry out *uninvolved* instructions. He ignores the "uninvolved" portion of the DOT's definition, but detailed *but uninvolved* instructions would certainly seem to be within the grasp of someone capable of simple one- to three-step work. *Cf. Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(work demanding a reasoning level of 3 within the capacity of someone limited to simple, unskilled work). Again, there is no obvious conflict – if there is a conflict at all – that the ALJ should have noticed without an objection from Mr. Hobbs's counsel.

**4.**

Finally, Mr. Hobbs complains that the ALJ's hypothetical to the VE limited him to simple one- to three-step tasks did not adequately account for his moderate limitations in concentration, persistence, or pace. (Dkt. # 17, at 12-13). Mr. Hobbs relies exclusively on *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). There, the court noted that generally, the ALJ is required to orient the VE to all of a claimant's limitations, including those inhibiting concentration persistence, or pace. 627 F.3d at 619.

While the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include them directly in the hypothetical, there is no requirement that the terminology "concentration, persistence, or pace" be used. 627 F.3d at 619. Here, the ALJ translated her finding that Mr. Hobbs was moderately limited in concentration, persistence, or pace into a

limitation to simple, one- to three-step jobs. By doing so, she offered the VE a more concrete idea of Mr. Hobbs's limitations than had the state agency physician, Dr. Havens, who had expressed Mr. Hobbs moderate limitation as a restriction to "simple assignments . . . repetitive, routine tasks." (R. 454).

Dr. Havens' articulation is the kind that the Seventh Circuit found wanting in *O'Connor-Spinner.* 627 F.3d at 620 (". . . limiting a hypothetical to simple, repetitive work does not necessarily address deficiencies of concentration, persistence and pace."). The ALJ improved upon it and, while not perfect, her articulation was adequate.[7] It allowed the VE to eliminate positions which would pose significant barriers to someone like Mr. Hobbs. 627 F.3d at 620. Dishwasher and janitor jobs would not pose such barriers.

Beyond that, Mr. Hobbs confusingly argues that, in order to compensate for his moderate difficulties in concentration in this manner, the ALJ had to find that those difficulties "were due to performing tasks which were more than three steps." (Dkt. #17, at 13). It is unclear how performing tasks of more than three steps would result in concentration deficiencies, and had the ALJ made such a finding, one would have to question her logic. The argument makes no sense.[8] The ALJ, instead, much more logically found that Mr. Hobbs was limited to simple, one- to three-step tasks due to his moderate difficulties with concentration. His concentration difficulties, in turn, were due to his

---

[7] It remains a mystery why, in the wake of a cases like *O'Connor-Spinner*, ALJs do not simply parrot a moderate limitation on concentration to the VEs, and avoid any criticism by claimant's counsel and the courts.

[8] The argument is not the result of a typographical error, as Mr. Hobbs repeats it twice on page 13 of his opening brief. (Dkt. #17, at 13)("The ALJ pointed to no evidence or opinion in the record which indicated that Plaintiff's difficulties with concentration were due to performing tasks with any particular number of steps."; "Without finding that Plaintiff's difficulties in concentration were due to performing tasks which were more than three steps, it is unclear that the ALJ compensated for moderate difficulties . . .").

mental impairment, not due to performing tasks of no more than three steps. The ALJ's hypothetical, while not perfect, accounted for the difficulties that were supported by the credible evidence in the record.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [Dkt. #16] is DENIED, and the Commissioner's motion for summary judgment [Dkt. # 21] is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 12/5/14